```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF GEORGIA
                     COLUMBUS DIVISION
```

| | | |
|---|---|---|
| KYLER COLEMAN, a minor, by and<br>through his Parents and Natural<br>Guardians, BRANDI COLEMAN AND<br>LARRY POOLE, and BRANDI COLEMAN<br>AND LARRY POOLE, Individually, | *<br><br>*<br><br>* | <br><br><br><br>CASE NO. 4:05-CV-17 (CDL) |
| Plaintiffs, | * | |
| vs. | * | |
| UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |
| _____ | * | |

## O R D E R

This case arises from injuries suffered at birth by Plaintiff Kyler Coleman. Presently pending before the Court is Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. 44). For the following reasons, the Court denies Defendant's motion.

### FACTUAL BACKGROUND

On July 14, 1997, Plaintiff Kyler Coleman was born at Martin Army Community Hospital ("MACH") at Fort Benning, Georgia. (Compl. ¶ 15.) When Kyler's mother, Brandi Coleman, arrived earlier that morning for a regularly-scheduled doctor's appointment, she reported noticing a slight decrease in fetal movement over the previous three days. (Coleman Dep. 30:12-32:8, Sept. 28, 2007.) Kyler was delivered by emergency Caesarean-section after the MACH medical staff observed signs of potential fetal distress. (Coleman Decl. ¶ 3, Mar. 3, 2008.)

Kyler experienced numerous problems following his emergency delivery.  After his birth, the MACH staff found a blood clot in Kyler's umbilical cord.  (Coleman Dep. 56:17-20.)  Kyler also had poor coloring, responsiveness, and reflexes, and meconium had to be suctioned from his throat.[1]  (*See* Ex. C to Pls.' Resp. to Def.'s Mot. to Dismiss at 136.)  In addition, Kyler's blood glucose level dropped to zero at some point.  (*Id.* at 134.)  Kyler also developed respiratory difficulties and pulmonary hypertension, and he was eventually transported to the Medical Center in Columbus, Georgia for treatment in the neonatal intensive care unit.  (*See* Coleman Decl. ¶¶ 5-7.)  Kyler remained at the Medical Center for about eight days and returned to MACH for about two days before he was discharged.  (Coleman Dep. 63:17-20; 69:20-24.)  Ms. Coleman alleges that she was told that Kyler's injuries were caused by aspiration of meconium and pulmonary hypertension, which were "unpreventable."  (Coleman Decl. ¶¶ 4-6; *see also* Coleman Dep. 51:6-11.)  No mention was made of Kyler's blood glucose problems.  (Coleman Dep. 65:24-66:4.)

Kyler saw physicians at MACH for the first nine months of his life.  (*See* Coleman Dep. 71:7-22.)  After nine months, Ms. Coleman took Kyler to Dr. Rita Moreck, a pediatrician in private practice in Columbus.  (*Id.* at 72:24-73:2.)  Dr. Moreck observed that Kyler was

---

[1]Meconium is fecal material released by a fetus, and meconium aspiration poses serious health risks to the fetus.  Ms. Coleman was told by nurses at MACH that "they needed to perform a c-section because there was meconium in my amniotic fluid."  (Coleman Decl. ¶ 3.)

developmentally delayed and microcephalic,[2] and she found it "clear . . . that Kyler was neurologically devastated and that his problems resulted from an event which occurred at around the time of his birth." (Moreck Decl. ¶ 4, Feb. 5, 2008.) Ms. Coleman informed Dr. Moreck that Kyler's caregivers at MACH observed meconium-stained fluid at birth and pulmonary hypertension, and Dr. Moreck "told Ms. Coleman that Kyler's developmental problems and neurological deficits were a result of trauma that happened at or around the time of his birth." (*Id.*)  Dr. Moreck suggested that Ms. Coleman begin seeking specialists to treat Kyler. (*Id.* ¶ 5.)  Kyler was also sent for a CT scan, which confirmed that Kyler had brain damage. (Coleman Dep. 78:3-10.)  Kyler was later diagnosed with cerebral palsy and was treated at a multi-disciplinary cerebral palsy clinic. (Coleman Dep. 96:1-22.)

Ms. Coleman was prompted to seek legal advice when Kyler was approximately seven years old after she encountered a patient in a nursing home whose cerebral palsy had been caused by "birth injuries." (Coleman Dep. 74:11-23.)  Ms. Coleman retained counsel because she "wanted to know what really happened." (*Id.* at 74:22-23.)  Plaintiffs' counsel attempted to recover Kyler's complete medical records from MACH, and in the meantime, he filed an administrative claim with the Government Claim Office at Fort Benning "in order to preserve Kyler's legal claims." (Nohr Decl. ¶¶ 3-7,

---

[2]"Microcephalic" means that Kyler had an unusually small head size.

Mar. 10, 2008.)  After receiving a portion of Kyler's records, Plaintiffs' counsel hired an expert to examine them; the expert opined that Kyler's neurological problems were caused by hypoglycemia, an abnormally low level of glucose in the blood. (*Id.* ¶ 8.)

Plaintiffs filed their Complaint in this Court on February 18, 2005, alleging that MACH personnel committed medical malpractice because they "(a) did not properly test and monitor Kyler for hypoglycemia, (b) ignored the signs and symptoms of hypoglycemia Kyler was exhibiting after birth, and (c) failed to promptly and adequately treat Kyler's hypoglycemia when recognized." (Compl. ¶ 18.)  Plaintiffs alleged that these acts and omissions caused Kyler to "suffer[] a prolonged episode of profound but preventable hypoglycemia" which in turn caused Kyler "to suffer from permanent and irreversible neurological injury and its *sequelae*[.]"[3] (Compl.

---

[3] In their administrative claim, filed July 12, 2004, Plaintiffs contended that Kyler's injuries included "permanent and irreversible neurological injury and its sequelae, including but not limited to cerebral palsy, spastic quadriparesis, microcephaly, psychomotor retardation, hypotonia, cerebral atrophy, and bilateral subluxated hips with bilateral lower extremity contractures." (Ex. A to Pls.' Compl. at 4.)  Plaintiffs contended these injuries were caused by "medical negligence," but they hypothesized more specifically that the cause of Kyler's injuries was "perinatal asphyxia, hypoxic-ischemic encephalopathy, and brain damage." (*Id.* at 3.)  Plaintiffs did not mention hypoglycemia as a source of Kyler's injuries in their administrative claim.
   Plaintiffs' counsel contends that the first time he received notice that hypoglycemia was a potential cause of Kyler's neurological injuries was after he had already filed the administrative claim. (Nohr Decl. ¶ 8.)  Accordingly, Plaintiffs' Complaint identifies the "actual" cause of Kyler's injuries—the same "permanent and irreversible neurological injury and its sequelae" as listed in their administrative claim—as the failure of MACH personnel to recognize and treat Kyler's hypoglycemia. (*See, e.g.,* Compl. ¶ 19.)  Additionally, Plaintiffs' counsel contends that

4

¶ 19.) Defendant filed the presently-pending motion to dismiss on the basis that Plaintiffs' cause of action was filed well outside the two-year statute of limitations applicable to federal tort claims, and therefore the Court lacks jurisdiction to decide the merits of Plaintiffs' claims.

## DISCUSSION

### I. Standard of Review

Defendant moves to dismiss Plaintiff's Complaint for lack of subject matter jurisdiction.[4] The Eleventh Circuit recognizes two types of challenges to a district court's subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. A "facial attack" on a complaint "require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction[.]" *Lawrence v. Dunbar*, 919 F.2d 1525,

---

medical records obtained after Plaintiffs filed their Complaint "revealed facts never previously known, including when the Government first knew Kyler's blood sugar was zero, the duration and extent of Kyler's hypoglycemia, the responsive measures taken by MACH nursing and medical staff, and the circumstances that contributed to the delay in recognition of and treatment for Kyler's hypoglycemia." (Nohr Decl. ¶ 11.)

[4] A circuit split exists as to whether "the timely filing of an administrative claim . . . is a jurisdictional prerequisite to filing suit under the [Federal Tort Claims Act]." *Compare Skwira v. United States*, 344 F.3d 64, 71 (1st Cir. 2003) (timely filing claim is jurisdictional), *with Hughes v. United States*, 263 F.3d 272, 278 (3d Cir. 2001) (compliance with statute of limitations is an affirmative defense). In the Eleventh Circuit, compliance with the two-year statute of limitations is jurisdictional. *Turner ex rel. Turner v. United States*, 514 F.3d 1194, 1200 (11th Cir. 2008) ("A federal court does not have jurisdiction over a suit under the [Federal Tort Claims Act] unless the claimant first files an administrative claim with the appropriate agency . . . within two years from the time the claim accrues . . . accompanied by a claim for money damages in a sum certain.") (internal quotation marks omitted) (alterations in original)).

1529 (11th Cir. 1990) (second alteration in original) (internal quotation marks and citation omitted).  On the other hand, a "factual attack" on a complaint "challenge[s] the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."  *Id.* (internal quotation marks and citation omitted).

Defendant mounts a factual attack on Plaintiff's Complaint.  "On a factual attack of subject matter jurisdiction, a court's power to make findings of facts and to weigh the evidence depends on whether the factual attack on jurisdiction also implicates the merits of plaintiff's cause of action."  *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1261 (11th Cir. 1997).  When the facts related to jurisdiction do not implicate an element of the plaintiff's claim, then "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Id.*  (internal quotation marks omitted).  When the facts related to jurisdiction do implicate the merits of a plaintiff's cause of action, then "[t]he proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case[.]"  *Id*. (internal quotation marks omitted) (second alteration in original).

The Court finds that the determination of when Plaintiffs' cause of action accrued in this case does not implicate the merits of their

tort claims.  Thus, the Court will essentially "conduct[] a bench trial on the facts that give rise to its subject matter jurisdiction."  *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1238 (11th Cir. 2002).  The Court will "weigh the evidence and satisfy itself as to the existence of its power to hear the case. . . . [N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims.'"  *Lawrence*, 919 F.2d at 1529 (quoting *Williamson v. Tucker*, 645 F.2d 404, 412-13 (5th Cir. 1981)).  Plaintiffs bear the burden of establishing that jurisdiction exists in the face of Defendant's factual challenge to subject matter jurisdiction.  *See, e.g., OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002).

**II.  Plaintiffs' Jurisdictional Allegations**

Plaintiffs assert medical malpractice claims against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*.  A tort claim against the United States is "forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues."  28 U.S.C. § 2401(b).  "The general rule is that a claim under the FTCA accrues at the time of injury."  *Diaz v. United States*, 165 F.3d 1337, 1339 (11th Cir. 1999) (citing *United States v. Kubrick*, 444 U.S. 111, 120 (1979)).  However, this rule has been modified in medical malpractice cases in order "to protect plaintiffs who are blamelessly unaware of their

7

claim because the injury has not yet manifested itself or because the facts establishing a causal link between the injury and the medical malpractice are in the control of the tortfeasor or are otherwise not evident." *Id.* Thus, a claim for medical malpractice does not accrue until "the plaintiff knows of both the injury and its cause." *Id.*

In determining whether a plaintiff knows of the cause of his or her injury, it is clear that a plaintiff does not need to understand that the injury may have resulted from medical malpractice; in other words, the plaintiff does not have to be aware that his injury was negligently inflicted. *See Kubrick*, 444 U.S. at 116-17, 123. Still, the plaintiff must have notice that the government caused the injury:

> "[t]he cause of which a federal tort claimant must have notice for the statute of limitations to begin to run is the cause that is in the government's control, not a concurrent but independent cause that would not lead anyone to suspect that the government had been responsible for the injury. The notice must be not of harm but of iatrogenic [doctor-caused] harm, though, as Kubrick holds, not necessarily of negligent iatrogenic harm."

*Diaz*, 165 F.3d at 1340 (second alteration in original) (quoting *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985)); *see also Price v. United States*, 775 F.2d 1491, 1494 (11th Cir. 1985) (holding that "a medical malpractice claim under the FTCA accrues when the plaintiff is, or in the exercise of reasonable diligence should be, aware of both her injury and its connection with some act of the defendant").

This rule does not permit a plaintiff to "bury her head in the sand once she is put on notice that the government may have caused an

8

injury." *Diaz*, 165 F.3d at 1339. In *Price v. United States*, the district court granted summary judgment to the defendant on the grounds that the plaintiffs' FTCA complaint was barred by the two-year statute of limitations. A doctor at the defendant Naval hospital performed a hysterectomy on the plaintiff after determining she was not pregnant. The plaintiff was, in fact, eight weeks pregnant, and she lost the fetus as a result of the hysterectomy. *Price*, 775 F.2d at 1493. The plaintiff "made no attempt to ascertain what had gone wrong" until nearly three years after the hysterectomy, and consequently, she brought her medical malpractice claim after the two-year statute of limitations had expired. *Id*. The Eleventh Circuit found that "[u]pon learning that she lost a fetus, [the plaintiff] was on notice that there had probably been an act of negligence. . . . The only reason she did not find out the particular cause of her injury is that she did not ask." *Id.* at 1494. The court concluded that "[o]nce the plaintiff discovers that her injury is probably attributable to some act of those who treated her, there is no longer any reason to toll the statute of limitations," and it affirmed the district court's grant of summary judgment in favor of the defendant. *Id* at 1493-94.

In this case, Defendant argues that Plaintiffs' claim accrued well before Plaintiffs filed their administrative claims on July 13, 2004, which was nearly seven years after Kyler's birth. Defendant contends that Ms. Coleman was aware "in July, 1997 of the

9

difficulties surrounding the childbirth, Kyler's poor color and lack of cry after his birth, the hematoma in the umbilical cord, and the respiratory distress that caused Kyler to be hospitalized at the Medical Center." (Def.'s Mot. to Dismiss 7.) In addition, Defendant argues that (1) in April 1998, Ms. Coleman was told by a private physician that "Kyler had developmental problems and neurological deficits that resulted from trauma at or around the time of his birth"; (2) "[i]n May, 1998, Kyler received a CT scan of his brain which confirmed brain damage"; and (3) "Kyler was treated by a number of specialists . . . and by at least December 1999 was being seen in a special multi-disciplinary cerebral palsy clinic." (*Id.*)  In essence, Defendant argues that "Plaintiffs' only reason for not finding out the 'particular cause' of the injury is because they 'did not ask.'"  (Def.'s Mot. to Dismiss 7 (quoting *Price*, 775 F.2d at 1494).)  Thus, Defendant contends, just as in *Price*, Plaintiffs' claims should be time-barred because Plaintiffs knew of Kyler's injuries and the possible connection to MACH medical providers by at least December of 1999.

The facts of this case are materially different from those of *Price*, however.  First, the cause of the injury in *Price* was known to the plaintiffs as soon as the injury occurred.  *Price*, 775 F.2d at 1494 (finding that "appellant knew within days of her operation that there had been some mistake in connection with the pregnancy test, and that those who treated her were probably responsible for her loss

10

of the fetus"). In this case, Plaintiffs did not learn of Kyler's hypoglycemia, the alleged cause of Kyler's injuries, until Plaintiffs' attorney secured Kyler's complete medical records from Defendant in July of 2004. (*See* Nohr Decl. ¶¶ 4, 5.)

Second, the record in this case suggests that Ms. Coleman did, in fact, investigate the cause of Kyler's injuries. Ms. Coleman stated that she specifically inquired as to the cause of Kyler's injuries at MACH and at the Medical Center. (Coleman Decl. ¶¶ 6, 7.) In contrast, the plaintiffs in *Price* "made no attempt to ascertain what had gone wrong." *Price*, 775 F.2d at 1493; *see also Kubrick*, 444 U.S. at 122-23 ("Kubrick need only have made inquiry among doctors with average training and experience in such matters to have discovered that he probably had a good cause of action. The difficulty is that it does not appear that Kubrick ever made any inquiry . . . .").

Third, and most importantly, Ms. Coleman avers that medical professionals told her (1) that the cause of Kyler's injuries was meconium aspiration and pulmonary hypertension (Coleman Decl. ¶¶ 3-5, 7); (2) that Kyler may have developmental delays because he had been on a ventilator to treat problems related to meconium aspiration and pulmonary hypertension (*id.* ¶ 7); and (3) that Kyler's injuries were not preventable and "that no one did anything wrong" (*id.* ¶¶ 6, 12).[5]

---

[5] It is notable that these assurances came not only from MACH personnel, but also from medical professionals employed by parties other than Defendant. (*See, e.g.,* Coleman Decl. ¶¶ 7, 9, 11.)

In addition, Ms. Coleman testified that no one ever told her that Kyler's blood glucose level had dropped to zero. (Coleman Dep. at 65:24-66:4.) Ms. Coleman averred that she relied on these assurances. (*See, e.g.* Coleman Decl. at ¶ 12 ("I assumed the doctors were telling me the truth and that [Kyler's] problems were unpreventable."); Coleman Dep. 140:21-23 ("I believed what the doctors told me.  I mean, I didn't have any reason to believe anything else.").

"[P]laintiffs seeking to understand the cause of an injury may reasonably rely on advice and assurances by doctors." *Chamness v. United States*, 835 F.2d 1350, 1353 (11th Cir. 1988).  Accordingly, the two-year statute of limitations prescribed by the FTCA may be tolled during periods of time that a plaintiff reasonably relies on her doctors' explanation of cause or assurances of recovery. *See, e.g., Burgess v. United States*, 744 F.2d 771, 774-75 (11th Cir. 1984) (holding that FTCA statute of limitations should have been tolled during period of time when parents knew of child's injury but were reassured by doctors that the child would fully recover); *accord Winter v. United States*, 244 F.3d 1088, 1090 (9th Cir. 2001) ("[A] cause of action does not accrue under the FTCA when a plaintiff has relied on statements of medical professionals with respect to his or her injuries and their probable causes.")

Defendant argues that information provided by Dr. Moreck, who first treated Kyler when he was nine months old, should have

triggered Ms. Coleman's duty to investigate the cause of Kyler's injuries. Dr. Moreck informed Ms. Coleman "that Kyler's developmental problems and neurological deficits were a result of trauma that had happened at or around the time of his birth." (Moreck Decl. ¶ 4.) However, Ms. Coleman avers that "Dr. Moreck never mentioned the word 'trauma' and never told me that any of Kyler's problems were caused by 'trauma,' and I do not even know what that means." (Coleman Decl. ¶ 11; *see also* Def.'s Ex. 2 to Coleman Dep., Physician Notes, Apr. 20, 1998 ("I feel that all this is probably related to whatever happened at birth secondary to the pulmonary hypertension.").) Regardless of the terminology actually used by Dr. Moreck, Ms. Coleman also attested that she believed Dr. Moreck "was agreeing with the other doctors that said Kyler's problems were 'unpreventable.'" (Coleman Decl. ¶ 11.)

Furthermore, Dr. Moreck's assessment came after Ms. Coleman had already informed Dr. Moreck that Kyler had problems with meconium aspiration and pulmonary hypertension at birth. Dr. Moreck apparently relied on the information provided by Ms. Coleman and did not independently check Kyler's medical records to confirm her analysis. (Coleman Decl. ¶ 10; Def.'s Ex. 1 to Coleman Dep., Physician Notes, Apr. 20, 1998.) More importantly, Dr. Moreck's statement merely confirmed what Ms. Coleman already knew: that Kyler had been injured and that his injuries likely occurred at or near the time of his birth. Dr. Moreck's declaration does nothing to explain whether Ms. Coleman should have known that Defendant's act or

13

omission, and not other "unpreventable" birth-related complications, caused Kyler's injuries. The same is true of the other evidence Defendant contends should have triggered Ms. Coleman's duty to seek medical and legal advice about Kyler's injuries. Although Ms. Coleman was aware of the various problems surrounding Kyler's birth and his later diagnoses, knowing that Kyler suffered injuries at the time of his birth is not equivalent to knowing that an act or omission of Defendant caused those injuries because not all complications arising from childbirth are attributable to human error. *See, e.g., Diaz*, 165 F.3d at 1340 (holding that "[w]hen there are two causes of an injury, and only one is the government, the knowledge that is required to set the statute of limitations running is knowledge of the government cause, not just of the other cause" (internal quotation marks omitted) (alteration in original)).

In sum, Ms. Coleman attests that she did not investigate the cause of Kyler's injuries because she was reassured by medical professionals that the cause of Kyler's injuries was unpreventable meconium aspiration and pulmonary hypertension. Therefore, based on the present record, Defendant is not entitled to dismissal on the basis that Ms. Coleman knew, or reasonably should have known, that Kyler's injuries resulted from an act or omission of MACH personnel.[6]

---

[6]The Court reiterates that its decision is based on the present record, which demonstrates that Ms. Coleman relied on explanations provided by medical personnel regarding the origins of Kyler's injuries. Thus, the fact that Ms. Coleman's investigation into Kyler's injuries was prompted by her chance encounter with a nursing home patient who exhibited symptoms similar to Kyler's was simply fortuitous; it is not, as Defendant

14

CONCLUSION

It is clear that Ms. Coleman endured a complicated and difficult delivery and that Kyler suffered serious injuries as a result. What is unclear from the present record is when Ms. Coleman should reasonably have made the link between Kyler's injuries and Defendant's acts or omissions. Given Ms. Coleman's virtually undisputed testimony that medical professionals lulled her into a false belief that Kyler's problems were attributable to pulmonary hypertension and meconium aspiration and were not preventable, the Court finds that the statute of limitations was tolled until she made the link between Defendant's acts and her child's injuries. The Court further finds that taking the tolling period into consideration, Plaintiff's claim was timely filed. Accordingly, the Court denies Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. 44).

IT IS SO ORDERED, this 29th day of September, 2008.

                                          S/Clay D. Land
                                            CLAY D. LAND
                              UNITED STATES DISTRICT JUDGE

---

suggests, evidence that Ms. Coleman failed to exercise reasonable diligence in investigating Kyler's condition.

    The Court also notes Defendant's argument that Ms. Coleman could have requested Kyler's records, which contained references to Kyler's hypoglycemia, in a more timely manner. However, at least one court of appeals has recognized that it would be "ghoulish" to require that "any time someone suffered pain or illness or death in a [government] hospital . . . [he must] request his hospital records to see whether diagnosis or treatment might have played a role in his distress." *Drazan*, 762 F.2d at 59. This is particularly true in this case, where the evidence before the Court indicates that Ms. Coleman relied on the opinions of medical professionals who had presumably either written or examined those records.